## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **YANCEY WILLIAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:22-cv-978-ACA** |
| | ) | |
| **BIRMINGHAM BOARD OF** | ) | |
| **EDUCATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Yancey[1] Williams is male, over the age of 40, and a current employee of Defendant Birmingham Board of Education. Mr. Williams contends that the Board intentionally promotes and pays younger, female assistant principals more than the Board has paid and promoted him in violation of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a), and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a). (Doc. 1).[2]

The Board moves for summary judgment as to all claims asserted against it,

---

[1] During his deposition, Mr. Williams testified that his first name is Yancey. (*See* doc. 18-11 at 2). The court therefore **DIRECTS** the Clerk of Court to update the docket to reflect that the appropriate spelling of Mr. Williams's name.

[2] The complaint's allegation of jurisdiction states that Mr. Williams also asserts claims under 42 U.S.C. § 1981; the Equal Pay Act, 29 U.S.C. § 606(d); and Alabama state law. (*See* doc. 1 ¶ 1). Mr. Williams does not plead any of those claims in his claims for relief. (*See id*. ¶¶ 20–48). Accordingly, the court's analysis is limited to the claims Mr. Williams has pleaded.

contending that Mr. Williams has not exhausted his administrative proceedings for his failure-to-promote claims and that the Board does not pay its assistant principals with discriminatory intent. (Doc. 16). The court is persuaded by the Board's first argument but not its second. Accordingly, the court **WILL GRANT IN PART** and **DENY IN PART** the Board's motion and **WILL ENTER SUMMARY JUDGMENT** in the Board's favor as to Mr. Williams's failure-to-promote claims. This case will proceed to trial as to Mr. Williams's disparate pay claims.

## I.   BACKGROUND

When approaching a motion for summary judgment, the court "view[s] the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve[s] all reasonable doubts about the facts in favor of the non-movant." *Washington v. Howard*, 25 F.4th 891, 897 (11th Cir. 2022) (quotation marks omitted). Where the parties have presented evidence creating a dispute of fact, the court's description of the facts adopts the version most favorable to the nonmovant. *See id.*; *see also Cantu v. City of Dothan*, 974 F.3d 1217, 1222 (11th Cir. 2020) ("The 'facts' at the summary judgment stage are not necessarily the true, historical facts; they may not be what a jury at trial would, or will, determine to be the facts.").

Mr. Williams is male, over the age of 40, and a current employee of the Board. (Doc. 18-14 at 49; doc. 18-11 at 3, 9). Mr. Williams has identified five other Board

employees, whom he contends are younger and of the opposite gender, holding the same or a substantially similar title that he holds, and receiving better pay: (1) Fallin Ladd (female, 41 years old); (2) Angelia Groves (female, 51 years old); (3) Erin Evans (female, 43 years old); (4) Raynada Moss (female, 43 years old); and (5) Nikedra Ward (female, 43 years old). (*See* doc. 26 at 7–10; *see also* doc. 18-1 at 11–13 ¶ 12, 16–17 ¶ 14, 25–26 ¶ 22, 28–29 ¶ 25, 29–30 ¶ 26). Before the court examines each employee's compensation history, the court will first describe the Board's compensation and promotion process. The court will then describe Mr. Williams's compensation history before examining his alleged comparators' compensation histories in turn.

### 1.  The Board's Compensation & Promotion Policies

The Board pays its personnel through a pay schedule. (*See* doc. 18-1 at 2 ¶¶ 4–5; *accord* doc. 18-12 at 10; doc. 18-13 at 37). According to this pay schedule, employee compensation is determined based on three numbers: (1) the role of the employee (*i.e.*, teacher, assistant principal, etc.), (2) the "rank" of the employee based on compensable certifications or education levels; and (3) the employee's "step," which reflects the employee's years of experience. (Doc. 18-1 at 2 ¶ 5).

Each year, the Board votes and approves a new pay schedule. (*Id.* at 2 ¶ 4; *see also*, *e.g.*, doc. 18-6 at 1–29) (the 2018 pay schedule). Relevant here, the pay schedule includes: (1) the promotion policy for promotions to new employee roles;

(2) the number of contract days for each employee; and (3) a set of tables for each employee role, which dictates employee compensation based on the employee's rank and step. (Doc. 18-6 at 3, 6–29). Each year, all employees should[3] receive a step increase even if that employee is not promoted to a new position. (Doc. 18-1 at 3 ¶ 7).

Although the Board has revised its new position promotion policy on a few occasions (*see* doc. 18-1 at 4 ¶ 8), the same policy was in effect for all promotions relevant to this lawsuit (*see* doc. 18-14 at 49) (indicating that the "earliest" date the discrimination made the basis of Mr. Williams's claims occurred is September 2020). That policy provides that when an employee is promoted, that employee will be placed on step 1 of the new schedule unless step 1 would not result in a 5% pay increase, in which case "the employee will be placed on the next appropriate step that allows the employee to receive at least a 5% increase in pay[]." (Doc. 18-6 at 3, 32, 62; *compare id.* at 62, *with* doc. 18-7 at 3, *and* doc. 18-1 at 4 ¶ 8).[4] The lack of clarity in this case seems to stem from confusion about what "pay" means.

---

[3] The court uses "should" because the Board's compensation records reflect a substantial number of "clerical error[s]" and a "payroll system error" in multiple employees' compensation calculations. (*See*, *e.g.*, doc. 18-1 at 7–9 ¶ 10, 10 ¶ 11, 13 ¶ 13, 17 ¶ 14, 18 ¶ 15, 22 ¶ 19, 23 ¶ 20, 24 ¶ 21, 26 ¶ 23, 28 ¶ 24, 30 ¶ 26).

[4] The Board did not provide the court with a complete copy of the FY2021 salary schedule, which was the schedule in effect at the time three of Mr. Williams's alleged comparators, were promoted. (*See* doc. 18-6 at 90–117). The undisputed evidence is that the Board implemented a revised promotion policy in 2012 (*see* doc. 18-4 at 31; *accord id.* at 60, 85, 112; doc. 18-5 at 3; doc. 18-6 at 3, 32), and the Board did not change that policy again until October 1, 2021, which was after each alleged comparator's promotion (*see* doc. 18-7 at 3; doc. 18-1 at 4 ¶ 8, at 16 ¶ 14,

Board employees are paid a salary, but the Board also tracks employees' "daily rate of pay" and "contract days." (*See* doc. 18-1 at 4 ¶ 8; *see also*, *e.g.*, doc. 18-9 at 12) (Mr. Williams's personnel action form for his 2018 promotion). An employee's daily rate of pay is calculated by dividing his salary by his contract days. (*See* doc. 18-1 at 12 ¶ 12). Different employees have different requirements for the number of contract days they work: of relevance to this case, teachers work 187 contract days and assistant principals work 204 contract days. (*See*, *e.g.*, doc. 18-6 at 32, 35, 49). And the Board's policy about ensuring that an employee receives a "5% increase in pay[ ]" when promoted does not explain whether "pay" refers to the daily rate or the salary. (*See*, *e.g.*, *id*. at 32); *see also supra* at 4–5 n.4. This matters because if "pay" means "salary," then the Board's method of calculating employees' post-promotion pay is not compliant with its policy, but if "pay" means "daily rate," it is.

All of Mr. Williams's alleged comparators were promoted from teacher positions to assistant principal positions. (*See* doc. 26 at 7–10; *accord* doc. 18-1 at 11–13 ¶ 12, 16–17 ¶ 14, 25–26 ¶ 22, 28–29 ¶ 25, 29–30 ¶ 26). Accordingly, when the Board promoted Mr. Williams's alleged comparators, the Board first gave those employees a 5% increase to their daily rate, and then multiplied the daily rate by the

---

29 ¶ 26). The Board represents—and Mr. Williams does not dispute—that the promotion policy in place for FY2021 was the same policy that was in place for Mr. Williams's promotion in FY20219.

204 contract days associated with being an assistant principal. (*See*, *e.g.*, doc. 18-1 at 12–13 ¶ 12). This calculation method resulted in annual salary increases of 14.55%–18.58% for Mr. Williams's alleged comparators. (*See*, *e.g.*, doc. 26 at 9); *see also infra* at 10–11, 13, 15.

Unlike most of Mr. Williams's alleged comparators, the Board does not explain how it calculated Mr. Williams's post-promotion salary. (*Compare* doc. 18-1 at 12 ¶ 12–13, *with id*. at 8 ¶ 10). During the time relevant to Mr. Williams's claims (*see* doc. 18-14 at 49), Mr. Williams already worked as an assistant principal (*see* doc. 18-1 at 8 ¶ 10; doc. 18-9 at 12). So whether the Board relied on Mr. Williams's annual salary or daily rate to calculate his post-promotion salary, Mr. Williams did not receive the additional benefit that his alleged comparators received, *i.e.*, an additional seventeen days when multiplying the post-promotion daily rate to his contract days. (*E.g.*, *compare* doc. 18-1 at 10 ¶ 10, *with id*. at 12–13 ¶ 12). Accordingly, Mr. Williams received a 5.22% increase to his salary when the Board promoted him. *See infra* at 8.

### 2.  Mr. Williams's Compensation History

In 1997, Mr. Williams began his employment as a teacher, which placed him on salary schedule 16. (Doc. 18-1 at 5 ¶ 10). He did not have any compensable certifications or education levels at that time, so he started at rank 1. (*Id*.). In 2003, Mr. Williams received a master's degree, which entitled him to a rank increase. (*Id*.;

*see also* doc. 18-9 at 4). In 2011, Mr. Williams earned a Double A (Class AA) certification, which entitled him to another rank increase. (Doc. 18-1 at 7 ¶ 10; *see also* doc. 18-4 at 17; doc. 18-9 at 8).

In 2018, Mr. Williams's salary was $69,360.96, reflecting the amount in salary schedule 72, rank 3, step 22. (Doc. 18-1 at 8 ¶ 10; *accord* doc. 18-9 at 12). That year, the Board temporarily reassigned Mr. Williams to a high school assistant principal position, resulting a move to salary schedule 67, rank 3. (*See* doc. 18-9 at 12). Assuming the Board followed its policy, then the Board moved Mr. Williams to salary 67, rank 3, step 1. (*See* doc. 18-6 at 3, 32; *but see* doc. 18-1 at 8 ¶ 10; doc. 18-9 at 12). But that schedule, rank, and step resulted in a salary of $66,957 (doc. 18-6 at 49), which was less than his previous salary (*see* doc. 18-1 at 8 ¶ 10). So Mr. Williams was entitled to "a 5% increase in pay." (*See* doc. 18-6 at 32).

The court has already described the ambiguity about what the promotion policy means by "a 5% pay increase." (Doc. 18-6 at 3); *see supra* at 5–6. For Mr. Williams's promotion, this ambiguity is immaterial because the Board placed Mr. Williams on the correct step either way.

If the Board used Mr. Williams's daily rate of pay to give him "a 5% pay increase" (*see* doc. 18-6 at 3), then the calculations are as follows: (1) Mr. Williams's

pre-promotion daily rate of pay was $340 (*see* doc. 18-9 at 12);[5] (2) a 5% increase to this rate would result in a daily rate of pay of $357; and (3) $357 multiplied by the 204 contract days for a high school assistant principal (*see* doc. 18-6 at 49; *accord* doc. 18-9 at 12) creates an annual salary of $72,828. The salary step closest to that amount in schedule 67, rank 3 is step 8, which results in an annual salary of $72,984. (Doc. 18-6 at 49). And that is the step the Board placed Mr. Williams on. (*See* doc. 18-9 at 12).[6]

If the Board used Mr. Williams's annual salary to give him "a 5% increase in pay" (*see* doc. 18-6 at 32), then the calculations are as follows: (1) Mr. Williams's was $69,360.96 (doc. 18-1 at 8 ¶ 10; *accord* doc. 18-9 at 12); and (2) a 5% increase would result in a salary of $72,829. The salary step closest to that amount in schedule 67, rank 3 is step 8, which results in an annual salary of $72,984. (Doc. 18-6 at 49). And again, that is the step the Board placed Mr. Williams on. (*See* doc. 18-9 at 12).

In total, Mr. Williams received a 5.22% pay increase for the 2018 promotion.

---

[5] Mr. Williams's personnel action form indicates his daily rate of pay was $331.71. (*See* doc. 18-9 at 12). As a mathematical matter, this calculation is erroneous because Mr. Williams's annual salary was $69,360.96 and he worked 204 contract days, which should result in a daily rate of $340. (*See id.*). In any event, it does not appear the Board relied on this form to reach Mr. Williams's post-promotion salary because the Board arrived at the correct step for Mr. Williams's post-promotion salary.

[6] The Board submitted an affidavit from its Employee Relations/District Investigator in which she attests that Mr. Williams was placed on step 9. (*See* doc. 18-1 at 8 ¶ 10). Mr. Williams was not placed on step 9; he was placed on step 8. (*See* doc. 18-9 at 12).

### 3.  Ms. Ladd's Compensation History

In January 2008, Ms. Ladd began her employment as a teacher, and in May of that year, Ms. Ladd earned her master's degree, which entitled her to a rank increase. (Doc. 18-1 at 11 ¶ 12; doc. 18-9 at 22–23; *see also* doc. 18-3 at 124). In 2012, Ms. Ladd earned a Double A (Class AA) certification, which entitled her to another rank increase. (Doc. 18-1 at 12 ¶ 12; doc. 18-9 at 24; *see also* doc. 18-4 at 33).

In 2017, Ms. Ladd's salary was $59,097, reflecting the amount in salary schedule 16, rank 3, step 10. (Doc. 18-9 at 25; *accord* doc. 18-5 at 6). And that year, the Board promoted Ms. Ladd to assistant principal of a high school. (*See* doc. 18-1 at 12 ¶ 12; doc. 18-9 at 25). Instead of first placing Ms. Ladd on schedule 67, rank 3, step 1 (*see* doc. 18-5 at 3), which would have resulted in a salary of $65,323 (more than 5% higher than her previous annual salary) (*see* doc. 18-5 at 19), the Board first calculated what a 5% increase to Ms. Ladd's daily rate would be (*see* doc. 18-1 at 12–13 ¶ 12).

The calculations proceeded as follows: (1) Ms. Ladd's pre-promotion daily rate of pay was $316.03 (*see* doc. 18-9 at 25; *see also* doc. 18-5 at 6); (2) a 5% increase to this rate would result in a daily rate of pay of $331.83 (*see* doc. 18-1 at 12 ¶ 12); (3) $331.83 multiplied by the 204 contract days for a high school assistant principal (*see* doc. 18-5 at 19; *accord* doc. 18-9 at 25) creates an annual salary of

$67,693.63 (doc. 18-1 at 13 ¶ 12). The salary step closest to that amount in schedule 67, rank 3 is step 6, which resulted in an annual salary of $70,077. (Doc. 18-5 at 19).

Because the Board calculated Ms. Ladd's post-promotion salary based on her daily rate, she received a 18.58% increase to her annual salary.

### 4.  Ms. Groves's Compensation History

In 1998, Ms. Groves began her employment as a teacher. (Doc. 18-1 at 16 ¶ 14; doc. 18-9 at 36). She earned her master's degree in 2003 and therefore received a rank increase. (Doc. 18-1 at 16 ¶ 14; doc. 18-9 at 37). And in 2008, Ms. Grovers earned a Double A (Class AA) certification, which entitled her to another rank increase. (Doc. 18-1 at 16 ¶ 14; doc. 18-9 at 38).

In January 2021, Ms. Groves's salary was $65,255,[7] reflecting the amount in salary schedule 16, rank 3, step 23. (*See* doc. 18-9 at 39; *but see* doc. 18-6 at 92; doc. 18-1 at 16 ¶ 14). And that year, the Board promoted Ms. Groves to assistant principal of an elementary school. (Doc. 18-1 at 16 ¶ 14; doc. 18-9 at 39). Placing Ms. Groves on salary schedule 66, rank 3, step 1, *see supra* at 4–5 n.4, would have resulted in an

---

[7] The Board submitted an affidavit from its Employee Relations/District Investigator in which she attests as to the calculation methods for Mr. Williams's alleged comparator's salaries. (*See* doc. 18-1). The affiant attests that "[p]rior to her promotion, [Ms.] Groves was on Teacher Salary Schedule 16, Rank/Level 3, Step 23 with an annual salary of $65,254" (doc. 18-1 at 16 ¶ 14), and the affiant relies on Ms. Groves's personnel action form (doc. 18-9 at 39) for this assertion. Although Ms. Groves's personnel action form indicates that her salary was $65,254 (*see* doc. 18-9 at 39), the Board's salary schedule indicates that the assigned salary for Ms. Groves's rank and step was $65,255 (*see* doc. 18-6 at 92). For consistency purposes, the court uses the salary on the Board's salary schedule for all of Mr. Williams's alleged comparators when there is a discrepancy between the relevant salary schedule and the personnel action form.

annual salary of $62,945 (*see* doc. 18-6 at 105), which was less than Ms. Groves's pre-promotion salary. So Ms. Groves was entitled to placement on a step that resulted in a 5% increase to her salary, *see supra* at 4–5 n.4, which would have been step 8 at $68,746 (*see* doc. 18-6 at 105).

Instead, the Board calculated the 5% increase based on Ms. Groves's daily rate. (*See* doc. 18-1 at 16–17 ¶ 14). The calculations proceeded as follows: (1) Ms. Groves's pre-promotion daily rate of pay was $348.96[8] (*see* doc. 18-6 at 92); (2) a 5% increase to this rate would result in a daily rate of pay of $366.41 (*see* doc. 18-1 at 17 ¶ 14); (3) $366.41 multiplied by the 204 contract days required for an elementary school assistant principal (*see* doc. 18-6 at 105; doc. 18-9 at 39) creates an annual salary of $74,747.64 (*see* doc. 18-1 at 17 ¶ 14). But this amount exceeded the available salary ranges in schedule 66, rank 3, so the Board paid Ms. Groves $74,747. (Doc. 18-1 at 17 ¶ 14; *accord* doc. 18-9 at 39).

Because the Board calculated Ms. Groves's post-promotion salary based on her daily rate, she received a 14.55% promotion to her annual salary.

---

[8] Ms. Groves's personnel action form indicates that her daily rate was $348.95. (Doc. 18-9 at 39). The court assumes this calculation error derives from the fact that Ms. Groves's annual salary is incorrect on this form. *See supra* at 10 n.7. The Board's salary schedule provides that teachers work 187 contract days and Ms. Groves was at a rank 3, step 23, so her salary was $65,255. (*See* doc. 18-6 at 92). Her daily rate therefore should have been $348.96.

5. <u>Ms. Evans's Compensation History</u>

In 2004, Ms. Evans began her employment as a teacher. (Doc. 18-1 at 25 ¶ 22; doc. 18-9 at 74). She earned a Double A (Class AA) certification, which entitled her to a rank increase. (Doc. 18-1 at 25 ¶ 22; *see also* doc. 18-9 at 75). It appears that Ms. Evans may have also earned a master's degree, which may have entitled her to another rank increase. (*See* doc. 18-9 at 75) (indicating that Ms. Evans was at a rank 3 and that her highest degree was a "6 Year Degree").

In January 2021, Ms. Evans's salary was $65,255, reflecting the amount in salary schedule 16, rank 3, step 17. (*See* doc. 18-9 at 76; *but see* doc. 18-6 at 92).[9] And that year, the Board promoted Ms. Evans to assistant principal of a middle school. (*See* doc. 8-1 at 25 ¶ 22; doc. 18-9 at 76). Placing Ms. Groves on salary schedule 72, rank 3, step 1, *see supra* at 4–5 n.4, would have resulted in an annual salary of $63,138 (*see* doc. 18-6 at 106), which was less than Ms. Evans's pre-promotion salary. So Ms. Evans was entitled to placement on a step that resulted in a 5% increase to her salary, *see supra* at 4–5 n.4, which would have been step 8 at $68,944 (*see* doc. 18-6 at 106).

Instead, the Board calculated the 5% increase based on Ms. Evans's daily rate. (*See* doc. 18-1 at 25 ¶ 22). The calculations proceeded as follows: (1) Ms. Evans's

---

[9] As discussed above, *supra* at 10 n. 7, the court uses the salary on the Board's salary schedule. (Doc. 18-6 at 92).

pre-promotion daily rate was $348.96[10] (*see* doc. 18-6 at 92); (2) a 5% increase to this rate would result in a daily rate of pay of $366.41; (3) $366.41 multiplied by the 204 contract days required for a middle school assistant principal (*see* doc. 18-6 at 106; doc. 18-9 at 76; doc. 18-1 at 25 ¶ 22) creates an annual salary of $74,747.64 (*see* doc. 18-1 at 25 ¶ 22). But this amount exceeded the available salary ranges in schedule 72, rank 3, so the Board paid Ms. Evans $74,747. (Doc. 18-1 at 25 ¶ 22; *accord* doc. 18-9 at 76).

Because the Board calculated Ms. Evans's post-promotion salary based on her daily rate, she received a 14.55% promotion to her annual salary.

### 6.  Ms. Moss's Compensation History

In 2003, Ms. Moss began her employment as a teacher. (Doc. 18-1 at 29 ¶ 26; doc. 18-10 at 10). She then earned a master's degree, which entitled her to a rank increase. (Doc. 18-1 at 29 ¶ 26; doc. 18-10 at 7).

In 2021, Ms. Moss's salary was $60,548.00, reflecting the amount in salary schedule 16, rank 2, step 18. (Doc. 18-10 at 8). And that year, the Board promoted Ms. Moss to an assistant principal position. (Doc. 18-1 at 29 ¶ 26). The Board does not explain how Ms. Moss's post-promotion salary was calculated. (*See id*. at 29–30

---

[10] Ms. Evans's personnel action form indicates that her daily rate was $348.95. (Doc. 18-9 at 76). The court assumes this calculation error derives from the fact that Ms. Evans's annual salary is incorrect on this form. *See supra* at 12 n.9. The Board's salary schedule provides that teachers work 187 contract days and Ms. Evans was at a rank 3, step 17, so her salary was $65,255. (*See* doc. 18-6 at 92). Her daily rate therefore should have been $348.96.

¶ 26). The Board acknowledges that Ms. Moss was overcompensated and contends that her overcompensation was "due to a clerical error." (*Id.*).

Whatever the method of calculation, Ms. Moss received a 14.55% increase to her annual pay.

### 7.  Ms. Ward's Compensation History

In 2015, Ms. Ward began her employment as a teacher and had already earned her master's degree at that point. (*See* doc. 18-9 at 87; doc. 18-1 at 28 ¶ 25). She then earned an educational specialist degree, which entitled her to another rank increase. (Doc. 18-1 at 28 ¶ 25; doc. 18-10 at 3).

In 2019, Ms. Ward's salary was $65,255.00, reflecting the amount in salary schedule 16, rank 3, step 15. (Doc. 18-6 at 65; *see also* doc. 18-10 at 3–5).[11] And that year, the Board promoted Ms. Ward to interim assistant principal of a middle school. (Doc. 18-1 at 28 ¶ 25; doc. 18-10 at 4). Placing Ms. Ward on salary schedule 72, rank 3, step 1 (*see* doc. 18-6 at 62), would have resulted in an annual salary of $63,138 (*see* doc. 18-6 at 78), which was less than Ms. Ward's pre-promotion salary. So Ms. Ward was entitled to placement on a step that resulted in a 5% increase to

---

[11] The personnel action form for Ms. Ward's promotion to interim assistant principal does not indicate Ms. Ward's placement on the FY2020 salary schedule and indicates that Ms. Ward's "annual salary" was $1,000. (*See* doc. 18-10 at 4). But the personnel action form is not blank for FY2019 and indicates that Ms. Ward was on salary schedule 16, rank 3, step 14 that year. (*See id.* at 3). Because an employee receives a step increase for each year of employment (*see* doc. 18-1 at 3 ¶ 7), the court's recitation of the facts assumes Ms. Ward was on salary schedule 16, rank 3, step 15 and that she received the salary assigned to that salary schedule (*see* doc. 18-6 at 65).

her salary (*see* doc. 18-6 at 62), which would have been step 8 at $68,944 (*see* doc. 18-6 at 78).

Instead, the Board calculated the 5% increase based on Ms. Ward's daily rate. (*See* doc. 18-1 28 ¶ 25). The calculations proceeded as follows: (1) Ms. Ward's pre-promotion daily rate was $348.96 (*see* doc. 18-6 at 65); (2) a 5% increase to this rate would result in a daily rate of pay of $366.41; (3) $366.41 multiplied by the 204 contract days required for a middle school assistant principal (*see* doc. 18-6 at 78; doc. 18-10 at 4; doc. 18-1 at 28 ¶ 25) creates an annual salary of $74,747.64 (*see* doc. 18-1 at 25 ¶ 22). But this amount exceeded the available salary ranges in schedule 72, rank 3, so the Board paid Ms. Ward $74,747. (Doc. 18-1 at 28–29 ¶ 25; *accord* doc. 18-10 at 4).

Because the Board calculated Ms. Ward's post-promotion salary based on her daily rate, she received a 14.55% promotion to her annual salary. And in 2020, the Board transitioned Ms. Ward from interim assistant principal to permanent assistant principal. (*See* doc. 18-10 at 5; doc. 18-1 at 29 ¶ 25). The Board continued to pay her the $74,747 post-promotion salary. (*See* doc. 18-10 at 5; doc. 18-1 at 29 ¶ 25).

## II.     DISCUSSION

The Board moves for summary judgment as to all claims. (*See* doc. 16). Summary judgment is appropriate when a movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). The Board contends that Mr. Williams failed to exhaust his administrative remedies to the extent that his claims are based on a failure-to-promote theory. (*See* doc. 17 at 34–35). Because exhaustion is a threshold issue regarding whether Mr. Williams's claims are properly before the court, *see Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1345 (11th Cir. 2022), the court considers that argument first.

     a.  <u>Failure to Promote</u>

Mr. Williams contends that the Board refused to promote him because of his age and gender in violation of the ADEA and Title VII. (*See* doc. 1 ¶¶ 24, 38). The Board argues that Mr. Williams has not exhausted his administrative remedies as to this discrimination theory because this theory was neither included in his EEOC charge nor reasonably expected to grow from the allegations in his EEOC charge. (*See* doc. 17 at 34–35). Mr. Williams responds the scope of an EEOC investigation into his charge alleging disparate pay could give rise to a failure-to-promote claim. (*See* doc. 26 at 4).

Before filing a gender discrimination or age discrimination claim, a plaintiff must exhaust his administrative remedies by filing a charge of discrimination with the EEOC. *Patterson*, 38 F.4th at 1345 (gender discrimination); *Bost v. Fed. Express Corp.*, 372 F.3d 1233, 1238 (11th Cir. 2004) (age discrimination). "Because of that exhaustion requirement, a plaintiff's judicial complaint is limited by the scope of the

EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Patterson*, 38 F.4th at 1345 (quotation marks omitted).

This limitation fulfills the purpose of the exhaustion requirement: "that the EEOC should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts." *Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004) (quotation marks omitted; alterations accepted). Although federal courts "are reluctant to allow procedural technicalities to bar [employment discrimination] claims," "[t]he facts alleged in the charge matter most for determining what can reasonably be expected to grow out of an EEOC charge." *Patterson*, 38 F.4th at 1345. So "judicial claims are allowed if they amplify, clarify, or more clearly focus the allegations in the EEOC complaint, but . . . allegations of new acts of discrimination are inappropriate." *Gregory*, 355 F.3d at 1279–80 (quotation marks omitted).

In Mr. Williams's EEOC charge, Mr. Williams asserted that he worked as an assistant principal and "ha[d] more tenure than any other person in the [Birmingham School] District in that position." (Doc. 18-14 at 49). Mr. Williams stated his "pay was lower than other co-workers performing the same work." (*Id.*). Specifically, Mr. Williams identified four other assistant principals whom he contended were younger than him or of the opposite gender, had less experience or education than

he did, and received a higher salary than him. (*See id*. at 49–50). But Mr. Williams does not identify any promotions that the Board denied him. (*See id*.). Indeed, the sole focus of Mr. Williams's charge is that other assistant principals, some of whom were younger and of the opposite gender, "were making more [money] than [he was] with less experience and the same or less[er] degree." (Doc. 18-14 at 49).

Mr. Williams has not exhausted his administrative remedies with respect to any failure-to-promote claims. Accordingly, the court **WILL GRANT** the Board's motion and **WILL ENTER** judgment in the Board's favor as to that aspect of his claims.

b. Discriminatory Pay

Mr. Williams contends that the Board intentionally paid him less than younger, female assistant principals who performed substantially similar work in violation of the ADEA and Title VII. (Doc. 1 ¶¶ 24, 38). The Board contends that summary judgment is appropriate on these claims because (1) the Board compensates Mr. Williams's alleged comparators differently due to their different employment histories and (2) the Board has produced a pay schedule which accounts for its compensation practices. (*See* doc. 17 at 39–42). The court rejects the Board's first argument because it is not adequately briefed, and the court rejects the Board's second argument because a reasonable jury could find that the Board did not adhere to its pay schedule.

A party must adequately brief an argument by citing authority, referring to the facts of the party's case, and providing a "meaningful explanation" for how the legal authority "appl[ies] to [the party's] claim." *Harner v. Soc. Sec. Admin., Comm'r*, 38 F.4th 892, 899 (11th Cir. 2022). "[P]assing references" simply do not suffice. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014). And when a party fails to adequately brief an argument, that argument is forfeited. *United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (en banc); *United States v. Esformes*, 60 F.4th 621, 635 (11th Cir. 2023) ("declin[ing] to address the merits" of a "skeletal argument" that included only "a bare citation" to the record); *Christmas v. Harris Cnty.*, 51 F.4th 1348, 1354 n.4 (11th Cir. 2022) (holding that the plaintiff had forfeited an argument when she "dedicate[d] just two sentences to" it).

Here, the Board asserts that Mr. Williams's comparators are not "similarly situated to [Mr.] Williams because the differences in their respective employment histories that are used to determine placement on the Board's salary schedule are substantially different than his, and thus, they are compensated different steps on the Board's salary schedule." (Doc. 17 at 39). In essence, the Board asserts that Mr. Williams has not identified similarly situated employees because the employees he has identified are different and thus were treated differently. (*See id.*). But the Board fails to explain *why* Mr. Williams and his alleged comparators are different beyond a reference to "their respective employment histories." (*See id.*).

In many ways, Mr. Williams and his alleged comparators are similar. For example, other than Ms. Moss (who was on rank 2), Mr. Williams and his alleged comparators were all on rank 3 at the time of their promotion. (*See* doc. 18-9 at 12; *see also id*. at 25, 39, 76; doc. 18-10 at 3–5; *but see* doc. 18-10 at 8). Mr. Williams had more years of employment with the Board than any of his alleged comparators. (*See* doc. 18-9 at 1; *see also id*. at 22, 36, 74, 87; doc. 18-10 at 10). Yet Mr. Williams experienced a substantially smaller increase to his annual pay when he was promoted than each of his alleged comparators, *including* Ms. Moss.

Perhaps the Board intended to argue that this different compensation occurred because unlike his alleged comparators, Mr. Williams was not promoted from a teacher position to an assistant principal position. But it is impossible for the court to discern the precise basis for the Board's argument because the Board generally references differences in "employment histories" without further explanation. (Doc. 17 at 39). And the court cannot make arguments on the Board's behalf. *See Fils v. City of Aventura*, 647 F.3d 1272, 1284 (11th Cir. 2011) ("[D]istrict courts cannot concoct or resurrect arguments neither made nor advanced by the parties."). Accordingly, the Board has forfeited this argument by failing to adequately brief it.

The Board's second argument fares no better. The Board contends that its compensation practices are non-discriminatory because the Board adhered to its salary schedules. (*See* doc. 17 at 41–42). But the problem with this argument is that

a reasonable jury could find, based on the evidence the Board has submitted, that the Board did not adhere to its promotion policy. (*E.g.*, *compare* doc. 18-5 at 3) ("Upon promotion to a new position, an employee will be placed on 'step 1' of the new salary schedule . . . ."), *with* (doc. 18-1 at 12 ¶ 12) (skipping this step and calculating a 5% increase to Ms. Ladd's daily rate). So the court rejects this argument because it is not supported by the evidence.

The Board highlights that Mr. Williams cannot assert claims based on clerical errors in compensation calculations. (*See*, *e.g.*, doc. 17 at 42). Generally, that statement of law is true. *See*, *e.g.*, *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 756 (1998) (explaining that workplace discrimination claims require "intentional conduct"). Although the record is replete with "clerical errors" (doc. 17 at 42), the Board misinterprets Mr. Williams's claim. Mr. Williams contends that the Board has not compensated its employees in accordance with the promotion policy. (*See*, *e.g.*, doc. 26 at 6). The Board argues that it has adhered to its promotion policy and pay schedules (*see* doc. 17 at 41–42), and the evidence does not clearly support the Board's position.

The court has limited its analysis to what the Board has argued. *See Fils*, 647 F.3d at 1284. As the movant, the Board must demonstrate that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment *if the movant shows* that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law.") (emphasis added). The Board has not carried that burden with the arguments it has made; accordingly, the court **WILL DENY** the Board's motion as to Mr. Williams's discriminatory pay claims.

## III.   CONCLUSION

The court **WILL GRANT IN PART** and **DENY IN PART** the Board's motion. (Doc. 16). The court **WILL ENTER SUMMARY JUDGMENT** in the Board's favor as to Mr. William's failure-to-promote claims. This case will proceed to trial as to Mr. Williams's discriminatory pay claims.

The court will enter a separate partial summary judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this June 4, 2024.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE